No. 82-396

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

S. DENNIS THOMPKINS, d/b/a
PYRAMID BUILDERS,

Plaintiffs and Respondents,

-vs-

DAVID FULLER, COMMISSIONER OF THE
DEPARTMENT OF LABOR AND INDUSTRY,
STATE OF MONTANA,

Defendant and Appellant.

---

Appeal from:  District Court of the Fourth Judicial District,
In and for the County of Lake, The Honorable
James B. Wheelis, Judge presiding.

Counsel of Record:

For Appellant:

Paul J. Van Tricht argued, Dept. of Labor, Helena
Montana

For Respondents:

Thomas Hoover argued, Big Fork, Montana

For Amicus Curiae:

Joseph W. Duffy argued, Great Falls, Montana
(Montana State Bldg. Trades Council)

---

Submitted:  April 21, 1983

Decided:  July 21, 1983

Filed:  JUL 21 1983

*Ethel M. Harrison*

---

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The Department of Labor and Industry appeals a decision of the District Court of the Fourth Judicial District, County of Lake. This dispute deals with the amount of wages paid by a building contractor to his employees on a state-financed construction project. Essentially, this case involves interpretation of Montana's Little "Davis-Bacon Act," sections 18-2-401, et. seq., MCA (1979), which requires contractors on public projects to pay their employees "the standard prevailing rate of wages . . . applicable to the county or locality in which the work is being performed." Section 18-2-403(1), MCA, (1979). Initially, we note that the 1979 statutes are applicable to this case. We affirm the judgment with the exception of the attorney's fees.

In 1980 the University of Montana let contracts for the construction of a research laboratory at Yellow Bay on Flathead Lake. The respondent was accepted as the mechanical contractor. Prior to this time, respondent was primarily involved in residential construction. The laboratory was his first contract with a governmental entity. The respondent was not a signatory to any collective bargaining agreement, and all of his employees were nonunion.

The contract required the respondent to abide by the labor laws of the State of Montana; specifically, he was required to pay his employees the "standard prevailing rate" (SPR) applicable to the county or locality in which the work was being performed. The contract language was taken from various parts of Montana's Little Davis-Bacon Act. Concerning his responsibilities, he contacted a Kalispell attorney who reviewed the contract. Nothing was discussed concerning the SPR provision. Respondent also talked to the project architect and a contractor friend who had been coaching him. Through these discussions he believed himself to be in full compliance with Montana law.

Construction began and thereafter the State received a complaint that respondent was not paying his employees the SPR. The complaint was made by the business representative for the carpenters union of Northwest Montana. The union representative testified in part as follows:

> "Q. Did you have a conversation with Thompkins on this project? A. Yes, I encouraged him to join the Union.
>
> "Q. Did you encourage him to join the Union? A. I did.
>
> "Q. What did you tell him when he wouldn't join the Union? A. I said I'd have to do my job and whatever was available to me to try and get him to join.
>
> "Q. And what did you do? A. I reported it to the Department of Labor that I didn't think he was paying prevailing wage."

The State investigated and concluded that the complaint was legitimate. Below is a chart showing the wages that were actually paid by the respondent and the wages which the State claims should have been paid as the SPR.

| EMPLOYEE | JOB | WAGES ACTUALLY PAID | "STANDARD PREVAILING RATE" AS DETERMINED BY THE STATE |
|---|---|---|---|
| Marton | carpenter | $9.00/hour | Carpenters: |
| Becker | carpenter | $9.00/hour | 12.05/hour--5/1/79-4/30/80 |
| Ryland | carpenter | $8.00/hour | 13.02/hour--5/1/80-4/30/81 |
| Thompkins | carpenter | $11.00/hour | |
| Hale | laborer | $6.00/hour | Laborers: |
| Raudebaugh | carpenter/ superintendent | salaried | 10.55/hour--7/1/79-6/30/80 |
| | | | 11.45/hour--7/1/80-6/30/81 |
| | | | Carpenter/Superintendent |
| | | | 12.55/hour--5/1/79-4/30/80 |
| | | | 13.52/hour--5/1/80-4/30/81 |

The State claims that it considered three sources of information to determine the SPR: (1) wage rate information compiled by the Employment Security Division; (2) Davis-Bacon rates published by the United States Department of Labor; and (3) local collective bargaining agreements. However, the rates established by the State were taken verbatim from number three, collective bargaining agreements. According to the State, there was little variation between the three sources, and in such cases it has been the policy to adopt rates from the bargaining agreements.

The respondent commenced this action by seeking a declaratory

judgment in the District Court. The State filed an answer and counterclaim praying for an order requiring Thompkins to pay past due wages and penalties and attorney fees. Thompkins sought summary judgment but his motion was denied. A nonjury trial was held after which the District Court entered judgment in favor of the plaintiff/contractor. The Commissioner of Labor and Industry then appealed.

The appellant has raised the following issues: (1) whether the District Court erred by not adopting the commissioner's determination of the standard prevailing rate; (2) whether the District Court erred in its interpretation of the statutory phrase "work of a similar character;" (3) whether the admission of hearsay evidence was reversible error; and (4) whether the award of attorney fees to respondent was proper. We address these issues in turn.

Appellant's first issue is raised in response to the following comment by the District Court:

> "Defendant [appellant] argues that only the Commissioner of the Department of Labor and Industry has the authority to determine the prevailing rate of wages in a given area. Defendant ignores the plain meaning of the statute: 'The Montana Commissioner <u>may</u> <u>determine</u> . . .' M.C.A. §18-2-402(1979) . . . Because the power to determine the prevailing rate of wages is not exclusively that of the Commissioner, that power, at the time the parties entered into the contract in question, rested also with the plaintiff, subject to the standards set out in the applicable laws. The issue, then, on which plaintiff's request for declaratory judgment turns, is whether plaintiff rather than the defendant has made the proper determination of what their contract term 'standard prevailing rate of wages' as defined in M.C.A. § 18-2-401(a)(1979) means. The issue, contrary to defendant's position, is not whether and under what standards this Court may review a decision or determination of an administrative agency.

> "Plaintiff's request for a declaratory judgment would be a request for a review of a decision or determination of an administrative agency if in fact the commissioner of labor had determined the standard prevailing rate of wages for the job classifications in question. But the commissioner did not make the determination he was authorized to make under M.C.A. § 18-2-402(1)(1979)."

- 4 -

The District Court obviously viewed the problem as one of contract interpretation. Here, the contract required the respondent to pay his employees the SPR yet there were no specific hourly rates contained in the contract. The court focused on whether respondent, as a contracting party, properly interpreted the contract term "standard prevailing rate."

The appellant argues that: (1) it did make a determination of the SPR and its determination should have been granted deference by the court, and (2) the respondent did not have the statutory power to determine the rate. That power rests exclusively with the appellant.

We agree with appellant's second point; the respondent was not empowered by section 18-2-402(1), MCA, (1979), to determine the standard prevailing rate of wages. The statute in question stated: "[t]he Montana commissioner of labor may determine the standard prevailing rate of wages in the county or locality in which the contract is to be performed." Section 18-2-402(1), MCA, (1979). The District Court incorrectly concluded that since the power is permissive in that the "commissioner . . . may determine the . . . rate," it must also be nonexclusive.

A judge's task in construing statutes is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted . . ." Section 1-2-101, MCA. The court clearly violated this principle. The statute says nothing about being nonexclusive. On the contrary, the history of this legislation would indicate otherwise.

The original version of Montana's Little Davis-Bacon Act was enacted in 1931. Since then it has been amended several times. Montana's Act is analogous to the Federal Davis-Bacon Act which was also enacted in 1931. This kind of legislation has as one of its purposes the protection of local labor markets. The act prevents contractors from importing cheap labor to the detriment of local workers. This purpose is achieved by requiring contractors to pay the rate of wages prevailing in the locality. To allow

potentially self-serving contractors to determine the rate would defeat the legislative purpose. As the United States Supreme Court noted in a case construing the Federal Davis-Bacon Act:

> "[t]he language of the Act and its legislative history plainly show that it was not to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on government projects. Congress sought to accomplish this result by directing the Secretary of Labor to determine, on the basis of prevailing rates in the locality, the appropriate minimum wages for each project." United States v. Binghamton Construction Co. (1954), 347 U.S. 171, 176-77. 74 S.Ct. 438, 98 L.Ed. 594.

We hold that the authority to determine the SPR rests exclusively with the commissioner of labor under the statute. We also conclude that the District Court was incorrect in allowing the contractor to determine the SPR in the absence of such a determination by the commissioner. While we agree with the commissioner's contention that the respondent did not have the statutory power to determine the SPR, this conclusion by the court is not reversible error for the following stated reasons.

Appellant argues that it did make a determination of the SPR and that its figures should have been accepted unless they were shown to be arbitrary or capricious.

Here, the court focused on contract principles; framing the issue as whether the respondent made the proper determination of the contract term "standard prevailing rate." In other words, the court reasoned that the respondent, as a contracting party had the power to pay his employees at those rates which he believed would meet the contract requirements. However, this power is not the same as that granted to the commissioner under statute. The commissioner derives his power from statute, whereas the respondent derives his power from the contract. The District Court confused this distinction. This is probably the reason the court interpreted the statute as it did. Notwithstanding this confusion, the District Court reached the conclusion. Consequently, the error was harmless.

Next, appellant argues that it did make a determination of

the SPR and that its figures should have been accepted unless they were shown to be arbitrary or capricious. The focus of this argument concerns the appropriate standard of review. The District Court would have been obligated to affirm the agency determination even if it found it to be an arbitrary and capricious standard of judicial review. State ex. rel. Montana Wilderness Association v. Board of Natural Resources and Conservation (1982), _____ Mont._____ , 648 P.2d 734, 39 St.Rep. 1238. This standard recognizes agency expertise and prohibits a court from substituting its judgment for that of an agency. It has been argued that wage figures of the Commissioner did not exist at the time of contracting. Therefore, on this basis, there was not an agency decision. We do not entirely agree. The evidence shows that rates are not set for individual projects. The appellant determines prevailing rates each year during May or June. According to appellant, when a contract is entered into, these rates become applicable and the contractor then has a duty to contact the department to find out what he should pay his employees. Appellant relies on this practice to show an agency decision deserving of deference. We cannot accept this argument. We hold that even though the state's figures existed at the time of contracting, their mere existence cannot be held to constitute an agency decision.

Under the basic contract principles a party cannot be bound to terms he is not aware of. There must be meeting of the minds or mutual assent on all of the essential terms. Chadwick v. Giberson (1980), _____ Mont. _____, 618 P.2d 1213, 37 St.Rep. 1723. Here the contract stated: "[t]he standard prevailing rate of wage, that paid by other contractors in the area, must be paid for work performed." The respondent, unexperienced in public works projects, read this language and concluded that his wage rates were within the range of rates prevailing in the area. Respondent cannot be held to payment of specific rates that did not appear in the contract of which he had no knowledge, but only

existed somewhere within the bureaucracy. We note that this problem has been corrected by the legislature. The current law requires all bid specifications and contracts to contain the specific rates payable by contractors. Section 18-2-422, MCA, (1981). We hold the District Court did not error in its refusal to adopt the commissioner's rates.

The next issue raised by appellant is whether the District Court erred in its interpretation of the statutory phrase, "work of a similar character."

The statute which contains the disputed phrase states:

> "'<u>Standard prevailing rate of wages</u> . . . applicable to the county or locality in which the work is being performed,' <u>means those wages</u> which are <u>paid</u> in the county or locality <u>by other contractors for work of a similar character</u> performed in that county or locality by each craft, classification, or type of worker . . ." (emphasis added) Section 18-2-401(5)(a), MCA, (1979).

Appellant's argument is somewhat confusing. At one place in the brief, appellant argues that "work of a similar character" refers to similar public works projects. Furthermore, at trial, various witnesses for the state testified that the phrase means similar public works. Our problem is this; in these instances it appears that appellant is construing the statutory phrase to include <u>only</u> public works. However, in another portion of its brief, appellant lists several public works <u>and</u> commercial construction projects that it claims were of a similar character to the Yellow Bay Project. For analysis of this issue, we will assume that appellant does not distinguish between public and private projects. The statute makes no distinction in this regard, nor should we. Therefore, appellant's argument can be stated as follows: the statutory phrase "work of a similar character" refers to projects as a whole, either public or private, and not as the court found, to the various components or individual labor of projects.

If we were to accept appellant's definition, the statute could be paraphrased as follows; "'standard prevailing rate of

wages . . . means those wages . . . which are paid . . . by other contractors . . . [on similar projects] in that county or locality . . ." According to appellant, there were several public and commercial projects which were similar. These include work done on the Ronan School, the Saint Ignatius Water Improvement Project, a Polson industrial building, the Lake County Courthouse, the B and B Store in Polson, and Ready Mix Concrete in Polson. On the other hand, if the respondent's definition were accepted, the statute would read: "'standard prevailing rate of wages . . . means those wages . . . which are paid . . . by other contractors . . . [for similar types of labor] in that county or locality . . ."

We agree with appellant's interpretation. "Work of a similar character" refers to projects as a whole. Clearly, the federal law and accompanying regulations have focused on the type of project rather than the type of individual labor. However, we note that the language of the Federal Act is different. The analogous federal provision states: "specifications for every contract . . . shall contain a provision stating the minimum wages to be paid . . . based upon wages . . . prevailing . . . on projects of a character similar . . ." 40 U.S.C. section 276(a), (1964). The use of the word "projects" would certainly dictate the focus of the Federal Act.

Montana's Act uses the word "work" rather than "projects." A reading of the Act leads us to the conclusion that "work" is synonomous with "projects." For example, section 18-2-403(1), MCA, (1979) reads:

> "In any contract let for state, county, municipal, school, or heavy highway construction, services, repair, or maintenance work . . . there shall be inserted in the contract a provision requiring the contractor . . . to pay the standard prevailing rate of wages . . . in effect and applicable to the county or locality in which the work is being performed."
> (emphasis added)

The word "work" refers to "state, county, municipal, school, or heavy highway construction, services, repair, or maintenance

work." We find the word "work" refers to the entire project for which the contract is let.

Another example is section 18-2-401(5)(b), MCA, (1981). "When work of a similar character is not being performed in the county or locality, the standard prevailing rate of wages . . . shall be those rates established by collective bargaining agreements in effect in the county or locality . . ." If the foregoing section is to have any meaning, "work" must mean "projects." If "work" referred to individual labor it would be difficult to imagine any purpose for the rule. Where could one find a county or locality where absolutely no individual labor is being performed by carpenters, laborers, plumbers, or whatever the applicable trade, in order for the rule to apply. However, counties or localities could easily fail to have similar on-going projects such as highway construction.

We could imagine a situation where laborers are performing the same kinds of tasks on different projects. For example, a laborer working for a residential contractor could spend his time hauling bricks, as could a laborer working on a state office building. The only difference could be the rate of pay. The former could be earning $6 per hour while the latter could be earning $10 per hour; the difference between union and nonunion wages. Then, if the commissioner were required to determine the prevailing rate for laborers working on a state financed laboratory, based on rates paid by contractors for individual labor of a similar character, which rate would be appropriate? Should the commissioner be obligated to consider whether or not the laborers working on the laboratory will be hauling bricks? We think not. It only makes sense that "work of a similar character" cannot refer to individual labor. If the total project interpretation is used in the above example, the commissioner need only determine whether the laboratory is more similar to an office building or a residence. While this example is simplified, it illustrates the necessity of defining work of a similar character to mean

similar projects. Appellant points out, and we agree, that "[t]he Montana 'Little Davis-Bacon' Act was designed to preserve the existing wage patterns in the area, the existing wage differential between commercial and residential construction."

Although we agree with appellant's interpretation of "work of a similar character" we do not find error. We do recognize why appellant raised the issue. Appellant was prompted by a curious statement made by the District Court. The court stated:

> "this court can only conclude that work of carpenters, laborers and superintendents in residential construction is of a similar character to that which plaintiff's employees performed on the Yellow Bay Project. That is, the similarity is between the type of labor involved and not the type (i.e., government or private) of project involved."

This comment by the court is an incorrect interpretation of the phrase "work of a similar character." We cannot understand why the court made the statement. The court's analysis of the issue and its previous statements are clearly contrary. This statement is nothing more than verbiage, and certainly not of the nature on which to predicate error. What the trial court said, and what the court did, are two different things. From our following discussion, it is evident that what the court did was proper.

Here, this District Court as fact finder attached significance to two kinds of evidence. First was the testimony of James Thompson, the project architect. Thompson testified as follows:

> "Q. Would you explain the nature of the building that was built, Jim? Whether it was frame, log, what kind of a building was it that we're talking about here? A. It was basically a relatively simple structure, concrete block, exterior walls, open westbound style joists with a concrete floor poured over them for the floor over a crawl space. The roof structure was wood with a metal covering, the metal roof covering, the exterior finish of the building was a foam with a type of stucco finish over it.
>
> "Q. Would you characterize the job as a technical one or a simple one? A. I would say the job was relatively simple and could be broken down into a series of subcontracts. That it was a series of subcontracts that made it simple.

"Q. All right, would a contractor with sufficient experience to build a residence or apartment house have the working knowledge to complete this project. A. Most certainly.

". . .

"Q. Very well, putting up the block and putting up the sheet rock in this building, is that any different than putting up block or sheet rock in a home or in a commercial building? A. No.

"Q. It's one in the same. A. One in the same."

In view of the above-quoted evidence the court, in its conclusions of law, stated: "[t]he 'work of a similar character' to be performed, . . . was residential type construction." (emphasis added) In explaining this conclusion, the court said: "[t]he record reveals that the employees whose wages are at issue . . . were capable of building a residence. James Thompson, the project architect, testified that a contractor capable of working one residential building was also qualified to perform the contract . . ." (emphasis added)

Since the Yellow Bay project was much like building a residence, the court found important the evidence concerning rates paid by residential contractors in Lake County. The Court discussed the evidence as follows:

"The only evidence on the record regarding whether plaintiff [paid prevailing wages] is that introduced by plaintiff. The following is plaintiff's summary of that evidence.

"'To make an effort to determine what the prevailing wage is in Lake County the plaintiff called Mr. Doug Stam, local manager of the state job service office. Introduced into evidence was a list prepared by Mr. Stam which contained names of 50 contractors and he opined that approximately 15 of these contractors were capable of completing the Yellow Bay job. Mr. Stam also testified that he knew of his personal knowledge that the following contractors in Lake County were paying their employees the following wages:'

| "'CONTRACTOR | CARPENTERS | LABORERS |
|---|---|---|
| Mr. Durand | $10.00 | $7.00 |
| Mr. Olson | 9.00 | 7.00 |
| Mr. Feeber | 8.00 | 6.00 |
| Mr. McCrum | 8.00 | 5.00 |
| Mr. Galy | 8.00 - 10.00 | 4.00 - 5.00 |
| Mr. Baker | 8.00 - 11.00 | 4.50 - 6.00' |

"'Plaintiff called to the stand the following contractors and they testified they paid their employees the following wages:'

"'CONTRACTOR | CARPENTERS | LABORERS
--- | --- | ---
Wallace Olsen | $ 8.00 - 10.00 | $4.00 - 6.00
Allen Smith | 11.00 + fringes | 8.00
Dennis Paulson | 7.00 | ----
Daniel Jury | 6.00 - 8.00 | 5.00
Don Whiting | 7.00 - 8.00 | 5.00 - 6.00
Dan Baker | 7.00 - 8.00 | ----'

"'All of the contractors listed above are residents of Lake County, Montana; all testified that they did residential building (James Thompson testified that any contractor that could build a residence could have handled this public project) and the wages listed are those paid by the contractors during the year 1980. Each contractor employed from 1 - 8 employees during the year 1980. The defendant has taken the position that the prevailing rate of wages in the area is $11.13 plus fringe benefits (union scale). Only one contractor testified from Lake County (Al Smith) who pays his employees union scale and those employees work only on a part time basis. Virtually all other contractors were non-union and all witnesses who testified including Al Smith, the sole union contractor, were unaware of any other union contractor in Lake County.'

"This summary accurately reflects the evidence introduced regarding wages. It shows that a majority of the carpenters in Lake County represented in this survey who work on residential-type construction are paid $7.00 - $9.00 an hour and that laborers are paid $4.00 - $6.00 an hour. Presumably, the differences represent differences in individual training and experience.

"From these averages it is apparent that plaintiff paid the prevailing rate of wages in Lake County for residential-type construction for carpenters and a laborer."

In view of the two types of evidence, the court reasoned as follows: The testimony of the architect established that the Yellow Bay project was much like building a residence, therefore, the Yellow Bay project is of a similar character to residential construction. Consequently, the standard prevailing rate of wages must be those wages which are paid in the county or locality by other contractors involved in residential construction.

This reasoning is exactly what is called for in section 18-2-401(5)(a), MCA, (1981). The court's analysis clearly recognizes that "work of a similar character" means the total

- 13 -

project, not the various kinds of labor involved. We agree with that statutory interpretation. We do not understand why the court made the statement that "the similarity is between the type of labor involved and not the type . . . of project involved." In its conclusion of law number six the court unequivocally stated: "[t]he 'work of a similar character' to be performed under M.C.A. §18-2-401(3)(a) (1979) was residential type construction." These statements are conflicting. In such a situation we must give effect to the statement which makes valid the court's analysis.

Appellant's argument is really a manifestation of its disagreement with the court's conclusion that the "work of a similar character" to be performed was residential type construction. We note that the classification of residential construction is one of several classifications used by the Secretary of Labor under the Federal Davis-Bacon Act. Appellant goes to great lengths to instruct this Court on the history and development of the Davis-Bacon Act. According to appellant, this Court should support "uniformity between state and federal regulations and procedures." Presumably, part of that uniformity would be recognition of the United States Department of Labor's various classifications of construction. The compliance officer of the Labor Standards Division of the Department of Labor and Industry testified that the Federal Davis-Bacon rates are determined for three different types of construction; residential, building, and heavy and highway. Yet when asked about residential construction classification in Montana, the witness replied: "Okay, well, first of all, we don't use residential. We haven't had a need. Okay, building construction would be any type of building."

We do not attempt to define "residential construction" for the commissioner, nor do we hold that the statute requires this kind of classification. We only hold that the evidence supported the District Court's conclusion that construction of the Yellow Bay laboratory was "of a similar character" to residential

construction. We further hold that the evidence supported the court's conclusion that the respondent had paid the "standard prevailing rate of wages."

Next, appellant challenges the admission of what has been labeled the "Stam survey." At trial, Mr. Stam, the manager of the local job service office, testified concerning the rate of wages paid by contractors to carpenters and laborers in Lake County. The basis of his testimony came from a telephone survey conducted by himself the day before. He contacted several local contractors and asked them what their wage rates were. He testified at length concerning their responses. The evidence was clearly hearsay but was admitted over objection pursuant to Rule 803(24), Mont.R.Evid., which allows as exceptions to the hearsay rule "statement[s] not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness."

We hold that it was error to admit the testimony because the evidence did not have comparable guarantees of trustworthiness. In determining whether or not the evidence should be admitted, the Commission on Rules of Evidence noted that "[t]he guarantee of trustworthiness set out in the Commission Comments to each of the other exceptions [of Rule 803] is the criteria to be used in determining whether to apply this open-ended exception and find a 'comparable circumstantial guarantee of trustworthiness.'" We have reviewed the other exceptions contained in Rule 803 and find that the Stam testimony should have been excluded. For example, one of the exceptions deals with various kinds of public records and reports. Rule 803(8) Mont.R.Evid. Under this exception, date compilations of an agency are admissible if the information is the result of a regularly-conducted activity or a duty imposed by law. The Commission Comments to exception (8) refer to guarantees of trustworthiness under exception (6);

> "The guarantee of trustworthiness is provided
> by the nature of the record and the cir-
> cumstances of preparation, enhanced by
> 'systematic checking, by regularity and con-

- 15 -

> tinuity which produce habits of precision, by
> actual experience of business in relying upon
> them, or by a duty to make an accurate record
> as part of a continuing job or occupation.'"

Annotations to Mont.R.Evid. Commission Comments to Rule 803(6), p. 285. Exception number (8) is particularly appropriate to our consideration of the Stam testimony since the evidence consisted of data compiled by a state employee. There is no doubt that the evidence did not meet the guarantees of trustworthiness.

Even though the evidence was inadmissible, the error was harmless. Under Rule 61, M.R.Civ.P., "[n]o error in either the admission or exclusion of evidence . . . is ground for . . . disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

This rule was intended to prevent reversals based on inconsequential errors. Where substantial justice has been done, the litigation should be ended. Copenhaver et al. v. Northern Pac. Ry. Co. (1911), 42 Mont. 453, 113 P. 467. The admission of the contested hearsay evidence did not affect substantial rights of the appellant because the evidence was cumulative. The respondent called six local contractors to testify concerning their wage rates for carpenters and laborers. All of the contractors were Lake County residents and testified that they performed residential construction. Five of the six contractors paid their employees at rates similar to the rates paid by respondent. From this evidence, the court could logically conclude that respondent had paid the standard prevailing rate of wages. The "Stam survey" was not needed.

Finally, we consider whether the court abused its discretion in awarding attorney fees to the respondent? In the court's memorandum it is stated:

> "Plaintiff [respondent] has requested this
> Court to award him attorney's fees . . . he is
> not entitled to attorney's fees on statutory

> grounds . . . However, as an equitable
> measure, the Court may prevent a party from
> bearing the unconscionable burden of funding a
> lawsuit, even one against the state, which is
> the result of unjust policy."

It has long been the rule in Montana that in the absence of agreement between the parties or statutory authorization, a successful party is not entitled to an award of attorney's fees. Nikles v. Barnes (1969), 153 Mont. 113, 454 P.2d 608. This general rule is applicable to this case. The trial court attempted to rely on its equitable power in making the award. This was error. We recognize a very narrow exception to the above rule. A District Court does have equitable power to award attorney's fees where the prevailing party has been forced into an action that is frivolous and utterly without merit. Wilson v. Department of Natural Resources and Conservation (1982), _____ Mont. ____ , 648 P.2d 766, 39 St.Rep. 1294. Clearly, the exception is not applicable to this case.

The award of attorney's fees is vacated and the remainder of the judgment is affirmed for the reasons stated herein.

_____
Justice

We concur:

_____
Chief Justice

_____
_____
Justices

- 17 -

Mr. Justice John C. Sheehy concurring in part, and dissenting in part.

I concur (1) the Commissioner has exclusive power to determine the standard prevailing rates of wages under the State's statutes; (2) that "work of a similar character" refers to projects and not to types of labor; (3) that the Stam "Survey" was inadmissible; and (4) that no attorney's fees should be awarded. Otherwise, I put as much distance as possible between me and everything else that is said in the majority opinion.

It is easy to expose the sophistry of the majority. One need only ask, "If Yellow Bay Laboratory were a federal project, would Thompkins have had to pay Davis-Bacon wage-rates?" The answer is a resounding "yes". At the same time as the Yellow Bay project, contractors on the federally-funded Lake County Courthouse and Ronan School project paid Davis-Bacon wages based on the federal determinations. Here the State Commissioner had promulgated standard prevailing wage-rates applicable to Yellow Bay Laboratory. Thompkins did not pay the wage-rates. He clearly violated State law and the terms of his contract with the State. Almost universally it is recognized right, suitable, and expedient that state Little Davis-Bacon acts and the federal Davis-Bacon Act be construed in harmony. See Associated General Contractors v. State of New Hampshire, 306 A2d 204 (NH 1973). The purpose of the state act is to safeguard existing minimum wage standards and prevent unfair competition. Sec. 39-1-401 MCA.

It is incredible that a court of this level would state that here the Commissioner had indeed determined standard prevailing wage-rates which existed at the time the Yellow Bay Laboratory contract was entered into, and then to state that the State's wage figures are not a part of that contract. "There must," says the majority, "be a meeting of the minds or mutual assent on all of the essential terms." To assume that this contractor, counseled by an attorney, was so naive as not to know what "standard prevailing wage-rates" meant is itself naivete of the farthest reach.

The issue should not be so simply dismissed on the mere grounds there was no mutual consent to the standard prevailing wage-rates. The provisions of subsisting statutes in force and applicable to contract are incorporated in the contract much as those specifically set forth therein. Valier Company v. State, 123 Mont. 329, 215 P2d 966 (1950). Therefore, Thompkins contracted

if he paid less than the standard prevailing wages "as established under the public works contract", he forfeited Twenty-five (25) Dollars per day for each underpaid worker. Section 18-2-407, MCA. He contracted that the Commissioner of Labor may set the standard prevailing wage-rates. Section 18-2-402, MCA. Since Thompkins was not a signator to any collective bargaining agreement, he contracted to pay "negotiated fringe benefits" to his employees as wages by undertaking a state public-works contract. Section 18-2-405, MCA. These statutory provisions were part and parcel of this contract with the State whether specifically stated in his contract or not. It is not an excuse that the standard prevailing wage-rate "existed in the bureaucracy" as the majority states. It was Thompkins' statutory and contractual duty to comply with the findings of the lawfully established bureaucracy acting under statutory directives.

The inconvenient existence of these statutes and decisional contract law proved no deterrent to the district court, and is now no bar to the majority. One of the prime objects of the State's Little Davis-Bacon Act is to prevent contractors from taking advantage of the excess labor pool in a depressed locality. Pitting worker against worker in competition for the few jobs available by forcing them to bargain individually for the wages on public contracts is not good business or good policy for the State or any of its subdivisions. Prevention of cutthroat worker competition in the struggle to survive is something the courts ought to protect in the noblest performance of their duty. The majority fails its duty here. I dissociate myself from this result entirely. The district court judge, by assessing attorney's fees against the Commissioner where no statutory or equitable basis existed for attorney's fees, seemed determined to punish the State. This court, by side-stepping contract law, punishes the workers and awards the contractor a fatter profit from their rightful due.

Finally, this court errs, as did the district court judge, when it holds that building the Yellow Bay Laboratory was the same as building a house. Rare indeed is the house (it would be a castle) where the mechanical sub-contract, that portion of the project bid and won by Thompkins, amounts to Two Hundred Thirty-five Thousand (235,000) Dollars out of a Half-Million Dollar project.

(The plumbing contract was One Hundred Twenty Thousand (120,000) Dollars; the electrical about Eighty Thousand (80,000) Dollars.) Edgar Guest said, "It takes a heap o' livin' to make a house a home." It takes more than livin', it takes a heap o' plumbin' and a heap o' heatin' and coolin' to make a house a lab. (See Odgen Nash: "Come Clean, Mr. Guest".) But it does not take a Class A Contractor's License to build a house, and that is what State law required for a project the size of Yellow Bay Laboratory, Section 15-50-204, MCA. This court and the district court should have confined the search for prevailing wage-rates to the wages paid in the locality by the class of contractors eligible to build the project, that is, Class A Contractors.

_____
                 Justice John C. Sheehy

We Concur in the Dissent:

_____
                 Justice Daniel J. Shea

_____
                 Justice Frank B. Morrison